UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
THE UNITED STATES OF AMERICA, and
THE STATE OF NEW YORK, *ex rel.*,
MICHAEL P. KLIMETZ and WADE R. GORIA,

                         *Relators*,

          -against-

NEW YORK CITY DEPARTMENT OF EDUCATION,
and NEW YORK CITY DEPARTMENT OF
EDUCATION PANEL FOR EDUCATIONAL POLICY,
and KATHLEEN ELVIN, individually,

                        *Defendants*.
----------------------------------------------------------------X

**COMPLAINT**

**Docket No.:**

**FILED UNDER SEAL**

      MICHAEL P. KLIMETZ and WADE R. GORIA, private persons and *qui tam* "Relators,"

on behalf of themselves, as well as on behalf of the United States of America and the State of New

York, pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

(hereinafter "FCA"), and the New York False Claims Act, N.Y. Fin. L. §§ 187 *et seq.* (hereinafter

"NYFCA"), by and through their attorneys, BORRELLI & ASSOCIATES, P.L.L.C., as and for

their Complaint against the NEW YORK CITY DEPARTMENT OF EDUCATION and the NEW

YORK CITY DEPARTMENT OF EDUCATION PANEL FOR EDUCATION POLICY

(hereinafter "The Panel") (hereinafter, together, as "NYCDOE"), and KATHLEEN ELVIN,

individually, ("Elvin"), (together, with NYCDOE where appropriate, as "Defendants"), allege

upon knowledge as to themselves, their own actions, and the actions of others for which they have

personal knowledge, and upon information and belief as to all other matters as follows:

## INTRODUCTION

1.      This is a civil action to recover treble damages and penalties on behalf of the United States, the State of New York, and Relators, individually, arising from false and fraudulent claims and statements made and presented by Defendants, and/or their agents and employees, in violation of: (i) 31 U.S.C. § 3729(a)(1)(B), for knowingly causing false records or statements to be made to the United States Department of Education ("USDOE") that were material to having false claims paid by the United States based on the DOE's failure to comply with regulations material to receipt of federal funds provided through Title I and III of the Elementary and Secondary Education Act of 1965, as amended ("ESEA"), 20 U.S.C. §§ 6301 and 6821 *et seq.*, and "Part B" of the Individuals with Disabilities Education Act of 1990 ("IDEA"), as amended, 20 U.S.C. § 1411, *et seq.*; (ii) 31 U.S.C. § 3729(a)(1)(A), for presenting false claims for payment to USDOE relating to overbilling for educational services provided through Titles I and III of ESEA and IDEA Part B; (iii) N.Y. Fin. L. § 189(1)(b), for knowingly causing false records or statements to be made to the New York State Education Department ("NYSED") that were material to having false claims paid by New York State based on the DOE's failure to comply with educational funding regulations requiring compliance with ESEA Title I and Title III programs, and IDEA Part B; (iv)  N.Y. Fin. L. § 189(1)(a), for presenting false claims for payment relating to overbilling for education services provided through ESEA Title I and Title III programs and IDEA Part B to NYSED; and (v) any other claim(s) that can be inferred from the facts alleged herein.

2.      Relators bring this action based on Defendants' scheme to defraud the United States and New York by failing to provide educational services to students at the John Dewey High School (sometimes as "Dewey") in Brooklyn, New York, who were either: underachieving / failing; English Language Learners ("ELLs") whose native language is something other than

English; students with disabilities placed on an Individualized Education Plan ("IEP"); and even "mainstream" students who were prevented from achieving their potential due to Dewey's overall failure to provide a legitimate education to its students.

3.    Relators are the original source of the information in this *qui tam* action.

4.    Contemporaneously with the filing of this Complaint under seal, and contemporaneously with the service upon the United States Attorney General and the New York Attorney General, Relators have submitted or will submit a written disclosure statement to the United States and State of New York disclosing "substantially all material evidence and information" in their possession.

## PRELIMINARY STATEMENT

5.    As set forth below, Relators allege in this action that Defendant NYCDOE - - which is responsible for providing public education to over 1.1 million students in more than 1,840 schools across the City of New York (hereinafter "the City") - - has carried out, and continues to carry out rampant and unconscionable grade, attendance, and credit fraud since at least 2013 at what was once one of the City's crown jewel educational institutions, John Dewey High School, located at 50 Avenue X, Brooklyn, New York 11223.  As a result, NYCDOE has all but damned thousands of Dewey students and graduates to a tragic lack of education or undereducation, amounting to a veritable miscarriage of educational justice - - all while receiving millions of dollars of taxpayer money through USDOE and New York state pass-through funding administered by NYSED.

6.    NYCDOE's fraud at Dewey was spawned from ESEA's 2002 reauthorization bill, the No Child Left Behind Act ("NCLB"), and the American Recovery and Reinvestment Act of 2009 ("ARRA")'s amendments to Title I of ESEA, both of which are programs designed, in theory,

to improve teaching and learning for students at schools most at risk of failing to meet academic achievement standards. NYCDOE's perversion of these federal and state programs was carried out at the hands of Dewey's then-principal, Kathleen Elvin, who implemented a series of fraudulent schemes that awarded diplomas to thousands of students who either never attended classes or "attended" classes that never existed, while failing to provide promised government-funded services for students with disabilities. Through Elvin, NYCDOE used United States and New York State educational funds that were allotted to Dewey based on student attendance and "student need" - - academic need, economic need, and developmental need for children with disabilities - - to fraudulently increase Dewey's stature after NYCDOE designated the school to be a Persistently Lowest Achieving school ("PLA"), and subsequently, a "Turnaround School."

7.      Elvin, on behalf of NYCDOE, from at least October 2013 through July 8, 2015, engaged in at least three separate overarching fraudulent schemes perpetrated through a massive record-falsification operation, resulting in the submission of false and fraudulent claims for payment to, and the receipt of overpayment for services from, the federal and state governments through Dewey's annual receipt of budgetary funds.

8.      First, in an attempt to obtain a graduation rate of 100% notwithstanding actual attendance or achievement, Elvin directed Dewey staff to create fake courses under several monikers, including "Project Graduation," "College Explorations," and "CUNY Math." Students were then "programmed" into (i.e., had courses added to their in-progress academic transcripts) as many as fourteen class periods per day without a scheduled lunch or free period, including multiple different grade-level courses (such as English 9, 10, and 11 simultaneously), all of which were coded as a "Guidance" course during the school year and later converted to the applicable course designation on a given student's academic transcript after completing the "course." All students

received a passing grade for all courses - - including all of these non-existence courses - - guaranteeing increased graduation rates and ensuring continued receipt of ESEA Title I and Title III funds tied to student performance, attendance, and graduation rates.  Making matters worse, teachers were also required to "teach" courses within this fake programming scheme that were beyond the scope of their state-authorized teacher certifications - - explicitly violating NYCDOE and NYSED mandates and laws governing New York public school teacher certifications.

9. Second, Dewey failed to provide adequate educational services to special needs students placed on IEPs in many respects.  This included by: failing to complete necessary IEP implementation and monitoring; placing special needs students in classrooms with teachers who lacked special education certification; and over-programming IEP students into classrooms that exceeded minimum standards of education.  And similar to the first scheme above, Dewey also placed IEP students in these fake courses such as Project Graduation, awarding them credit for courses that did not legitimately exist, and further compromising their entitlement to free appropriate public education  ("FAPE") mandated by IDEA.

10. Similarly, through a third scheme, Elvin and her staff placed ELLs and English-speaking students in the same course, regardless of grade level, achievement, or needs, and in fact encouraged teaching large groups of native Chinese students required coursework *in Chinese* - - not in English - - and reporting these courses on students' transcripts as regular core curriculum courses taught in English.

11. Elvin carried out these three overarching schemes by reorganizing Dewey into "Houses," assigning loyal and obedient Assistant Principals ("APs") to each House, and monitoring compliance with her directives through electronic recordkeeping software used for

attendance and grading - - *Skedula*, and NYCDOE's now-defunct Achievement Reporting and Innovation System ("*ARIS*").

12.     As a result of these schemes, Dewey fraudulently obtained at least $11,977,743.00 in federal funding from 2013 through 2015 for its fiscal and academic years based on submitted annual certifications for payment premised upon fraudulent attendance, grade, and graduation records.  Of that amount, $9,827,554.00 was Title I funding, $350,985.00 was Title III funding, and $1,799,204.00 was IDEA Part B funding.

13.     And to maintain her control over the teaching staff and school administration, Elvin punished those who refused to carry out her schemes through issuing negative teacher evaluations to those who questioned these fraudulent practices and firing or forcing into retirement those who she could not control.

14.     Relators attempted to notify Defendant NYCDOE about Elvin's malfeasance at Dewey continuously from January 2014 through the present - - all with no acknowledgement or actual changes from NYCDOE.   On the contrary, even after Elizabeth Berlin - - Deputy Commissioner of Education for New York State - - issued a thoroughly damning audit on March 23, 2018, which virtually confirmed Relators' allegations, NYCDOE has now begun touting its "achievements" by claiming that graduation levels city-wide are at an all-time high, as recently as February 2019.  And as for Elvin, since leaving public view and no longer working as a principal, she currently earns the highest salary of her NYCDOE-career in a non-educator position with NYCDOE.  Thus, Defendant NYCDOE has gone all-in on its refusal to admit any wrongdoing and instead has adopted wholesale Defendant Elvin's and Dewey's fraudulent practices as furthering NYCDOE's systematic goal of presenting a glimmering picture of public education notwithstanding actual achievement.

## JURISDICTION AND VENUE

15.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1345, as this action arises under 31 U.S.C. § 3729 *et seq.*, and Relators bring claims on behalf of the United States.  The supplemental jurisdiction of the Court is invoked pursuant to 28 U.S.C. § 1367 over all claims arising under New York law and on behalf of New York state, which arise from the same material facts as the federal law claim.

16.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred in this District.

17.     Relators bring claims on behalf of the United States pursuant to the *qui tam* provisions of 31 U.S.C. § 3730(b)(1).

18.     Relators bring claims on behalf of the State of New York pursuant to the *qui tam* provisions of N.Y. Fin. L. § 190(2)(a).

## THE PARTIES

19.     Defendant NYCDOE is an agency of the City of New York responsible for providing public education and related services to children of the City, including those with special needs, and those whose first language is something other than English.

20.     Defendant Panel is the governing body of Defendant NYCDOE and the formal entity responsible for all decision making with respect to NYCDOE.

21.     Relators are residents of the State of New York and are both former teachers at Dewey and thus former employees of the NYCDOE.

22.     Relator Klimetz was a teacher in Dewey's science department from September 1995 until December 31, 2015.

23.     Relator Goria was a teacher in Dewey's social studies department from September 1996 through October 7, 2015.

24.     Defendant Elvin was the Principal at Dewey from March 16, 2012 through July 8, 2015.  Elvin currently works as an administrator with NYCDOE, at its central offices in the Office of Safety and Development.

## FACTS

*Statutory and Regulatory Framework*: **Relevant History of the Elementary and Secondary Education Act - - and its Reauthorizations through the No Child Left Behind Act, American Recovery and Reinvestment Act, and the Every Student Succeeds Act - - and the Individuals with Disabilities Education Act.**

25.     First enacted during President Lyndon B. Johnson's "War on Poverty," ESEA is the primary federal statute responsible for setting forth funding and educational standards and accountability for public primary and secondary educational institutions (i.e., elementary, middle, and high schools) across the United States.

26.     ESEA provides public school funding through several different mechanisms.  Most relevant to this action, ESEA Titles I and III provide financial assistance through state educational agencies ("SEAs"), which in turn, delegate those funds to local educational agencies ("LEAs") according to the percentage of students enrolled in public schools who come from families living below the federal poverty line as determined by the United States Department of Commerce.  Title I funds are targeted to help improve public school students' education who are most at-risk of failing to meet baseline federal and state academic achievement standards.  In general, Title I and III funds are allocated to schools based on students who are, *inter alia*: living below the poverty line; low-achieving children; and English Language Learners whose primary native language is something other than English.

8

27.     LEAs are eligible to receive Title I and III funding based on various factors.  One such factor concerns the "eligibility count" of a given LEA, which is determined based on the number of families in a given school or school district living at or below the poverty level with children attending a given school.

28.     Any given LEA is not permitted to count any data for any child who is not physically present at the school for a daily minimum time period required by NYSED. 34 C.F.R. § 222.37(b)(4)(i). Under NYCDOE rules, as promulgated under its delegated authority from the NYSED Board of Regents, City students must attend school on a full-time basis, including requiring a minimum of 90% attendance to be considered full-time and eligible for grade promotion. NYCDOE Chancellor's Regulations A-210 § I.A, III.C, D.  NYSED requires 180 days in a given school year, meaning that students must be present for at least 162 days per school year, or have no more than eighteen total absences to be counted for attendance purposes and be eligible for grade promotion.[1]

29.     In addition to Title I funding, ESEA also provides funding to SEAs and LEAs through Title III.  As is relevant to this action, Title III, Part A, helps ensure that ELLs attain English proficiency, develop high levels of academic achievement in English, and meet the same academic standards as all children are expected to meet - - including native English speakers.

30.     LEAs, through information submitted to their SEAs, which information underlies an SEA's application for funding to USDOE, obtain Title III funding through a formula allocating money for each eligible ELL student receiving educational assistance at an LEA's school.  While the amount received in any given year might vary based on the overall funds available, the amount

---

[1] *See* NYSED Attendance Memorandum, *available at*
https://stateaid.nysed.gov/attendance/attendance_memo.htm

earmarked for any given school is contingent upon the number of ELLs enrolled, and as is relevant here, attending school for a minimum number of days.

31.     In general, under ESEA, the United States Congress is responsible for paying approximately forty cents on the dollar for educational services provided to ESEA-eligible schools.

32.     New York's SEA responsible for administering New York's public education system is NYSED.

33.     New York City's LEA, responsible for providing public education to the City's children while complying with NYSED and USDOE rules, regulations, and policies, and while administering the City's responsibilities under ESEA, is Defendant NYCDOE.

34.     NYCDOE currently oversees 1,840 schools grouped into thirty-two different school districts as of September 2018, providing public and charter school education for over 1,135,000 students.  Of that enormous amount: 19.7% of all students city-wide are students with disabilities; 13.5% are ELLs; and a staggering 74% of all students are living at or below the federal poverty line.

35.     In 2001, Congress passed the No Child Left Behind Act ("NCLB"), reauthorizing ESEA and implementing new standards and requirements for schools receiving federal Title I and Title III funds.  Among the many changes to ESEA enacted through NCLB, most critical here was NCLB's emphasis on tying school accountability for continued receipt of federal funds to student performance on statewide annual standardized testing in math and reading.  A school's failure to achieve what NCLB deemed as its Annual Yearly Progress ("AYP") would result in receipt of varying degrees of a "needs improvement" designation, requiring school staff changes up to and including school closure.

36.     After several years of politically fraught discourse regarding the efficacy of NCLB, in 2009 Congress passed the American Recovery and Reinvestment Act ("ARRA"), which - - among many other things - - included an education component rolling out ESEA's then-latest reauthorization package.  Continuing some of NCLB's focus on attempting to improve school performance in public schools catering to students most in need, ARRA created several new funding streams under Title I.  In 2015, Congress passed the latest ESEA reauthorization bill, the Every Students Succeeds Act ("ESSA").  ESSA is the current version of ESEA that remains in full force and effect.

37.     One such source of funding was ARRA's new School Improvement Grants ("SIGs").  SIGs, authorized under section 1003(g) of ESEA Title I, as supplemented by ARRA, are grants to SEAs, which are sub-granted to LEAs, designed to provide federal resources to help raise the achievement of students in a LEA's lowest-performing schools.

38.     To become SIG-eligible, a school must be designated as "Persistently Low Achieving" ("PLA") by its LEA and/or SEA.  A school may be deemed a PLA school if the academic achievement of all students fails to meet NCLB / ARRA benchmark standards in reading/language arts and mathematics, and if the school's lack of progress on those standards has failed to sufficiently improve over a three-year period.

39.     SIG-recipient schools are organized into three "Tiers."  Tier I schools represent the lowest-achieving five percent of a given SEA's state-wide schools, with graduation rates below 60% and which also already receive Title I funds.

40.     LEAs must report SIG-recipient schools' AYP to their SEAs on an annual basis to continue to receive SIG (and other Title I and III) funding.  In so doing, the school / LEA must certify that the LEA's school-specific data is accurate and in compliance with all material USDOE

and NYSED rules and regulations necessary to receive the funds.  As is relevant to this action, some of the critical factors considered for each SIG-recipient school are: AYP status; student test score proficiency, including the number of students who participate in state-wide assessments in reading/language arts and mathematics; the percentage of ELLs who obtain "proficiency" in the English language; graduation rate; student attendance rate; and the number and percentage of students completing advanced coursework (i.e., college-credit-bearing courses). *See, e.g.,* 20 U.S.C. § 6311(b)(2); 34 C.F.R. § 200.19(b)(4)-(5) [determining and reporting AYP], 200.20(g)(2)(i)(A)-(C) [meeting AYP goals / proficiency mathematics and language arts].[2]

41.    SIG-recipient schools are then designated into one of four "models" for improvement: "Turnaround," "Restart," "Close/Consolidate," or "Transformation."  As is relevant to this action, Turnaround schools are required to replace the school's principal and up to 50% of school teachers and staff to help ensure that improvement metrics are met.  When a Turnaround fails, the school may be converted to the Restart model, wherein the school is closed and "restarted" under the management of a charter school operator or management organization.

42.    Once a school is designated as one of these four models, the school and its LEA are responsible for establishing three-year student achievement goals in reading/language arts and mathematics, and ensuring compliance with targeted annual improvement goals.  Again, the school and its LEA must certify annual compliance with these improvement goals to continue receiving funds.

43.    As is relevant to this action, SIG funding at Dewey was eventually supplanted by School-Wide Program ("SWP") funding under ESEA Title I.  As with SIG, SWP funding required AYP targets to be met, and for schools to implement strict program guidelines to be analyzed and

---

[2] *See also* U.S. Department of Education, *Final Requirements for School Improvement Grants* (as Amended, Jan. 2010), *available at* https://ies.ed.gov/ncee/pubs/20114019/pdf/20114019.pdf .

12

reported on an annual basis to ensure successful implementation and progress. 20 U.S.C. § 6314(b); 34 C.F.R. § 300.206(b)-(c)

44.     With respect to all Title I funding, SEAs must monitor AYP targets on an annual basis, ensuring that all public schools within the LEA in the state make its AYPs. 34 C.F.R. § 200.12(a)(2).  AYPs must, at a minimum, ensure that all public school students meet the state's minimum academic achievement standards and help narrow achievement gaps within and across the LEA in general. 34 C.F.R. § 200.13(a)(1)-(2).

45.     With respect to high school specifically, state AYPs *must* calculate and measure graduation rates for all public high schools. 34 C.F.R. § 200.19(a)(1).  LEAs within any SEA must report annual graduation rates at each school within the LEA, and ensure that said reports accurately reflect improvements or minimum achievement school-wide for graduation / grade promotion to continue to meet the school's and LEA's AYP. *Id.* §§ 200.19(a)(3)(ii), (a)(4)(i).

46.     If an LEA designates a school as needing improvement due to failure to meets its AYP, the LEA must place the school on a School Improvement Plan within three months of said designation.  Funding for any identified school must allocate at least 10% to professional development to help improve the school's performance.  And critically, the LEA must ensure that a school immediately implements a peer-reviewed school improvement plan within forty-five days of receiving its designation. 34 C.F.R. § 200.41(c)(3)-(5), *id.* § 200.41(d)(a).

47.     If a school identified by an LEA fails to improve its achievement of AYP requirements, the LEA must, *inter alia*, replace the school staff who are relevant to the school's failure to make AYP, decrease management authority at the school level, and restructure the internal organization of the school. 34 C.F.R. § 200.42(b).

48.    Similarly, if an LEA fails to comply with its obligations under Title I, the SEA must - - at a minimum - - defer or reduce programmatic or administrative funds for the LEA's school in question, or the LEA, in general. 34 C.F.R. § 200.53(c)(i)-(v).

**IDEA Funding**

49.    In addition to ESEA Title I and III funds, NYCDOE receives federal and state funding through IDEA to provide public education to children with disabilities.

50.    Originally passed in 1975 as the Education for All Handicapped Children Act, Congress passed IDEA in 1990.  IDEA provides federal funding for public education to eligible children with disabilities throughout the nation and ensures that special education services are duly provided to all those in need.  Through IDEA, SEAs and LEAs receive formula and discretionary grants to support special education and related services for children with disabilities from birth through age twenty-one.  As is relevant to this action, IDEA Part B funding provides grants to SEAs and LEAs for children from ages three through twenty-one, including all high school students in need.

51.    Should USDOE learn that any given SEA or LEA has failed to implement and safeguard the necessary requirements of Part B of IDEA, USDOE may choose to either withhold - - in whole or in part - - further payments under IDEA Part B, or recover funds already paid. 34 U.S.C. §§ 300.604(b)(ii), (iv), (v).

52.    IDEA requires schools to ensure that students with disabilities are provided with a FAPE.  To ensure FAPE compliance, schools must provide special education to meet the unique needs of its enrolled students living with disabilities.  A critical component of ensuring a FAPE for every student is the creation of a unique Individualized Education Program ("IEP") for each student with a disability enrolled in the school.  As part of every IEP, a school must ensure that

14

the student is afforded the "least restrictive environment" possible, including by allowing side-by-side instruction where appropriate with "mainstream" students, meaning those who do not receive any special education.

53.     For every student eligible to receive special education, the student's school must create an annual IEP. 34 C.F.R. § 323.  The IEP is a legal document that contains an explicit statement of measurable annual goals - - including annual academic goals - - for the student's progress towards receiving a FAPE.  An IEP team must be convened to ensure that goals are set and monitored with the specific needs of the student in mind, including: the student's parents; at least one regular education teacher of the child; at least one special education teacher or provider of the child; an LEA representative; and, where appropriate, the student. 34 C.F.R. § 300.321.

54.     Notably, with respect to *all* USDOE programs funding SEAs and LEAs, the failure by any state or local recipient of USDOE program funding to maintain records required by law, or to allow the USDOE access to such records, constitutes a prima *facie case* allowing for recovery and/or withholding of USDOE funds. 20 U.S.C. § 1234a(a)(3).

**NYCDOE's Fair Student Funding Formula**

55.     With these and other federal programs in mind, NYCDOE determines each school's budget funding through the "Fair Student Funding" ("FSF") formula.  Each school's budget is determined on a line-item basis, described through annual School Allocation Memoranda ("SAMs") issued by NYSED.  NYCDOE's FSF covers basic instructional needs and is allocated to each school based on the number of students and specific attributes of the school.

56.     In total, for the 2018-2019 academic year, NYCDOE's annual budget amounted to $32.3 billion, of which 57% was funded directly by New York City, 37% was funded by New York State, and 6% was funded through the Federal government.

57.     As is relevant to this action, each school has designated "Categorical Allocations," which include state and federal programs such as ESEA Title I, III, and IDEA funding described above.  At bottom, NYCDOE's FSF is designed to ensure that budgeted money follows and is attributable to each student in a given public school, with NYCDOE tying specific per-student metrics to each budgeted line-item of a given school's funding.

58.     After a baseline of $225,000.00 per school, NYCDOE determines each school's individual budget by accounting for several different factors, including, as is relevant to this action: children below the poverty line; ELL students; special education students; and the specific number of students *__attending__* school - - with students in grades nine through twelve receiving a specific "weight" per student attending school.

59.     Notably, with respect to special education, schools with special education students who are more than 60% integrated with "mainstream" students receive nearly four times as much per-student funding than schools that are 60% "self-contained" special education students (i.e., schools where special education occurs separately from mainstream students).

**John Dewey High School: from Crown Jewel to Turnaround School**

60.     John Dewey High School is a public school located in the Gravesend neighborhood of Brooklyn, New York.  First conceived through an academic meeting of the minds held in Hershey, Pennsylvania in 1963, dubbed the "New School," Dewey opened on September 8, 1969 as the City's original "educational-option" school, meaning applicants were admitted through city-wide entrance exams.

61.     Occupying fifteen acres of property in a principally residential community one mile north of the Coney Island shorefront, Dewey was originally founded under the belief that students should have freedom to explore areas of interest while fostering and promoting intellectual inquiry

and academic growth and achievement. Designed as a uniquely open and free school, Dewey's main building and surrounding campus is more closely akin to the feel of a college campus. Spanning fifteen acres, Dewey remains the largest underutilized tract in south Brooklyn.

62.      One of Dewey's signature features was its five "Resource Centers." Each Resource Center was staffed by teachers and paraprofessionals, allowing students to obtain one-to-one personalized tutoring and assistance with homework, projects, or independent study in all major subjects.

63.      In recognition of its unique status, Dewey garnered national and local awards and attention over several years. After being named a "New American High School" by USDOE in 2000 for its high level of success - - the final year such award was given - - NYCDOE exempted Dewey from the City's city-wide curriculum requirements in 2003. Dewey also obtained the rank of "Top 500 Schools" by U.S. News & World Report in 2007, and in both 2008 and 2009, Newsweek tapped Dewey as being in the nation's top 6% of all high schools.

64.      When first opened in 1969, Dewey enrolled a freshman class of 1,130 students. Currently, Dewey enrolls 2,172 students.

65.      For the 2014-2015 school year, Dewey enrolled 1,962 students. Of those students, 24% were ELLs, 13% were students with disabilities, and 84% of all students were economically disadvantaged (i.e., at or below the poverty line).

66.      Despite its many and wide-ranging accolades, not all that glittered was gold for Dewey. In its 2009 application to USDOE to obtain SIG funding, NYCDOE designated Dewey as a Tier I school, seeking substantial funding from the federal and state governments with the goal of eventually closing Dewey, shrinking the campus, and developing its fifteen acres of valuable real estate.

67.     USDOE awarded NYSED a SIG grant that year, designating Dewey as a Tier I school under the "Restart" model, which would eventually require Dewey's closure.

68.     In 2010, NYCDOE tagged Dewey with a PLA designation as part of its initial AYP implantation to receive the SIG.  As a result, Dewey received $1,650,000.00 in SIG funds, which was to be paid out over the course of three consecutive school years if Dewey met its AYP targets.

69.     In 2012, after failing to meet its necessary AYP metrics, NYCDOE, through NYSED, applied for and was granted a "waiver" from USDOE, allowing it to continue receiving funding despite failing to meet its AYPs.

70.     As a result of the waiver receipt, Dewey was re-designated from the "Restart" model to the "Turnaround" model in January 2012.

**Dewey Hires Elvin as Principal**

71.     On March 13, 2012, NYCDOE fired Dewey's then-principal, Barry Fried, and installed Defendant Kathleen Elvin as Principal.

72.     But rather than help implement changes necessary to legitimately correct Dewey's AYP deficiencies, Elvin installed staff and administrators that helped her manufacture fraudulent records with respect to academic achievement, attendance, grade promotion, and graduation.

73.     That is, from her installation until her forcible removal amidst multiple investigation of wrongdoing, Elvin converted Dewey into a large-scale fraud factory, systematically designed to obtain as much federal and state funding as possible without any regard whatsoever to the actual needs of Dewey's students.  Elvin perpetrated this gross educational injustice by implementing school-wide systems of segregation of both students and teachers, enforced through mafia-like intimidation, which encouraged document and record fraud of a

18

gargantuan scale.  The fraud spanned virtually all departments, grade-levels, and classes, with Elvin - - through her Assistant Principals ("APs") - - mandating attendance, grade, and credit fraud.

74.     Elvin had previously laid the groundwork for her destruction of Dewey's school administration in her role as principal at Williamsburg Prep - - one of several schools located at the former site of Harry Van Arsdale High School ("Van Arsdale") at 257 North 6th Street, Brooklyn, New York 11211.

75.     Elvin became principal at Van Arsdale in 2006.  At NYCDOE's direction, Elvin carried out the school's closure and reorganization in the 2007-2008 school year.  The following year, NYCDOE, with Elvin's direction, reorganized the campus into Harry Van Arsdale Educational Complex, which included several smaller public and charter schools including the new Williamsburg Prep.

76.     When closing Van Arsdale and developing Williamsburg Prep, Elvin hired and trained a core staff to help carry-out Elvin's scheme to facially present Van Arsdale as a success story.  This included Emily Creveling, Andrew Kenney, Eunice Chao, and Adam Lustig.

77.     In just two years' time, Williamsburg Prep was deemed an enormous success and a completely reorganized school, featuring new teaching techniques, parent inclusion, and improving graduation rates.  Continuing Elvin's practices - - even after her departure - - Williamsburg Prep's graduation rate climbed to 91% by 2012, with a college acceptance rate of 98% that same year.

78.     Elvin left Williamsburg Prep at or around the conclusion of the school year in 2010.

79.     Then, Prior to Dewey, she was appointed as the Regional Director of the consulting firm, New Leaders for New Schools ("NLNS"), heading up its Manhattan office.  NLNS was

designed to train aspiring career school administrators seeking to obtain principal or AP-level positions throughout New York City public schools.

**Elvin Fractures Dewey Administration to Prevent Discovery of Systematic Fraud and Implements School-Wide "Expectations" for "Success" through Fraudulent Grading**

80.     Shortly after her arrival, on August 2, 2012, Elvin wrote to Sharon Holder, Director of NYSED Office of Innovative School Models, to explain Elvin's plan to meet Dewey's AYP and to help achieve improved academic and graduation performance school-wide.  Tellingly, Elvin there made reference to how her "administrative team created systems for ongoing review of student qualitative and quantitative data and a plan for interventions to improve class passing rates, credit accumulation and college readiness."  In the same letter, Elvin claimed that "all students were scheduled for classes every period of the instructional day," and that principal and assistant principal classroom visits provide "feedback to teachers [] tailored to specific next steps for instructional improvement."

81.     Through her August 2, 2012 letter, Elvin previewed the steps she planned to take to "turn around" Dewey - - but Elvin did not share, of course, her fraudulent means to accomplish her goals.

82.     To carry out her plan, from September 2012 through 2013, at the start of the school years, Elvin hired several members of her former staff from Williamsburg Prep, as well as staff from other schools who had worked closely with Elvin at Williamsburg Prep (making them loyal to Elvin and thus easy to control), all to serve as APs at Dewey, specifically: Eunice Chao, Andrew Kenney, Adam Lustig, and Emily Creveling.  Elvin also recruited and hired additional staff that would comply with her directives without objection, including Jon Messinger, Richard Webster, and Marianna Werth.

83.     Elvin then segregated Dewey into five subdivisions dubbed "Houses," and installed these five APs as co-supervisors of each House, along with several other APs under her control. The Houses were given the following titles; "International," "STEM," "Health/Occupations/Med-Tech," "Senior," and "Arts."

84.     Each "House" consisted of fixed groups of students, teachers, and administrators. Elvin prohibited students from attending classes with any students from any other Houses regardless of educational need.  Similarly, Elvin mandated that all teacher meetings and professional development be restricted by House, meaning that teachers and staff were largely isolated from teachers and staff in other Houses.

85.     A year after dividing Dewey into Houses, Elvin began laying the groundwork for massive grade and credit fraud during July and August of 2013.  To do so, Elvin - - with the assistance of the five APs listed above, among others including but not limited to Lawrence Orsini, Frank Benpensata, Madeline DiLorenzo-Coscia, and Eric Shapiro - - developed a new system of course coding involving all academic departments being required to teach all subject areas regardless of teacher certification, accomplished by coding these "courses" as "Guidance" courses on student programs.

86.     At the commencement of the 2013-2014 school year, Elvin rolled out at least three new initiatives to fraudulently boost Dewey's school-wide student grade point average, attendance, and eventual graduation rates - - all in an effort to obtain continued receipt of IDEA, SIG, ARRA, and other Title I and III funding set forth above.

87.     These initiatives were dubbed "Project Graduation," "College Explorations," and "CUNY Math."  Each initiative included several courses that existed on paper only, all of which were designed to guarantee a passing grade of at least 85 for all students - - which Elvin referred

21

to as either school-wide or House "expectations" - - regardless of student academic performance and actual attendance in any classes.

88.     The failure to assign a grade of at least 85 for any student would result in the House supervisor scheduling a "conference," designed to intimidate the teacher into boosting grades regardless of justification.  If a teacher did not comply with Elvin's directives and failed to boost student grades beyond 85%, the teacher would receive a negative teacher evaluation for "failing to meet school expectations."

89.     By complying with Elvin's directives, Dewey created widespread fraudulent grade and attendance records that were used to create the appearance the Dewey had complied with its necessary school improvement metrics, which allowed Dewey's continued receipt of federal funding and allowed Elvin (and her eventual successor) to maintain administrative and managerlial control of Dewey to the detriment of its hundreds of students.

90.     For virtually all courses within "Project Graduation," "College Explorations," and "CUNY Math," students were programmed into a single course alongside other students from all grade levels.  Each course was assigned a "G" course code - - which is solely meant for guidance courses, not Regents-level subjects - - and an arbitrary number used to track student enrollment in the same.

91.     All Project Graduation, College Explorations, and CUNY Math courses existed in name only.  That is, none of these courses contained: any course materials beyond simple Regents prep exam questions; actual testing materials; textbooks; actual physical classrooms for students to attend class that were differentiated by grade year; or any other typical requirements of a normal school class/course.  Indeed, there was no requirement for any students to attend any classroom for instruction on any given day in any course programmed under these three initiatives.

92.     At the conclusion of each semester, Elvin mandated that all teachers assigned to any Project Graduation, College Explorations, or CUNY Math courses give *all* students programmed into any of these courses a passing grade of at least 85% and to ignore any attendance issues.  This included ELLs, ELAs, and IDEA-funded students with IEPs / special needs.

93.     Elvin monitored compliance with her mandates through the use of two electronic systems: *Skedula* and the ARIS.

94.     *Skedula* is a computer-based online grading system where teachers were required to input each and every test grade, mid-term grade, and final semester course grade for each student on a teacher's course roster.  In addition, *Skedula* enabled teachers to enter homework and lab grades for each student, anecdotal notes, and any other information relating to a given student or course.  *Skedula* also featured attendance records in addition to the hand-written scantron bubble attendance sheets each teacher completed for each course each day.

95.     Elvin required teachers to complete their Skedula records in real-time.  However, school administrators could and did override the system and enter alterations at will.  That is, all Dewey administrators had access to all Dewey educators' *Skedula* records, and were free to alter any grade throughout the semester in any class including final semester grades, without the permission or awareness of teachers.  By way of one example, as described below, AP Eunice Chao manually entered grades for Relator Klimetz's Project Graduation course using *Skedula* in February of 2014.

96.     Once a marking period grade was submitted through *Skedula*, a teacher was unable to unilaterally alter the grade.  Instead, a teacher had to fill out a hand-written "Grade Change Form," including an explanation for the change, and provide the same to an AP, who, in turn, delivered it to the school's Program Office.

23

97.     Absent any changes, an individual student's grade submissions to NYCDOE through *Skedula* were entered onto the student's master academic transcript, which was then used to verify the student's promotion and/or graduation eligibility.

98.     In addition to *Skedula*, Elvin mandated regular use of ARIS for all teachers.

99.     NYCDOE first implemented ARIS in 2007.  At the cost of over $95,000,000.00, ARIS was designed to provide educators with a consolidated view of student achievement data and instructional resources through a single online platform.  Teachers, administrators, and even parents could search ARIS records in real-time to track the progress of their students / children - - including by displaying historical transcript information for all Regents-level courses throughout a student's high school career, as well as that student's individual attendance records for all courses on his transcript throughout his career up to and including then-present-day records.  ARIS was decommissioned and brought off-line at the end of the 2014-2015 school year, City-wide - - within **three weeks** of Elvin's removal from her position of Principal at Dewey, as described below.

100.     For each class, Elvin required each student's individual ARIS records to be printed out and placed in a binder.  This was for both teacher use and various daily meetings between teachers and APs / Elvin to review at random to confirm both student attendance and student grading.  These ARIS records were meant to back-up any student's given progress towards promotion / graduation and individual college readiness metrics (i.e., a guaranteed minimum of 85% passing grade).

101.     In reality, *Skedula* and ARIS, viewed together, provided an instantaneous and real-time snapshot of student course grades and attendance records, enabling Relators to discover Defendants' fraud in black and white.

24

102.     Relator Klimetz ultimately used and accessed ARIS to uncover the rampant fraud described herein, as ARIS provided a real-time snapshot of the school-wide fraud by giving access to current course lists per teacher, as well as the students listed in each "course" - - including designating what students were ELLs, grade repeaters or at risk of grade repetition, IEP students, and a full history of all Regents credits obtained to date.

103.     Relator Klimetz first began understanding the breadth and depth of Defendants fraudulent scheme on or around October 19, 2013, when he was assigned to his first Project Graduation class - - nearly a month and a half into the school year, rather than at the start of the semester as would normally be the case in any actual curriculum.

104.     Relators were both already scrutinizing Elvin and her APs' behavior because beginning in September 2013, Klimetz, Goria, and other teachers were assigned to classes then-known as "Function" course.  Students were placed in these "Function" courses in what was framed as an effort to bring certain students who had fallen behind in their grades "up to speed" on their Regents requirements to graduate or advance to the next grade level.   Although students were placed in these "Function" courses and assigned to Relators and other teachers, students ultimately never showed up for these course assignments.  As a preview of what was to come with, e.g., Project Graduation, teachers were given no course materials, no outline, no list of objectives, and no instructions other than an attendance roster with students' names listed.

105.     Approximately one month later, and after ending "Function" courses, Elvin rolled out "Project Graduation" in its stead.

106.     Both Relators and several other teachers were assigned to "Project Graduation" courses in October 2013.

107.    Each "Project Graduation" course featured: a list of students; a pre-printed list of materials (such as worksheets or old Regents exam prep questions) that were unique to each student; no textbooks; and no course outline.

108.    The students programmed in any given Project Graduation course were required to sit in the classroom and complete their respective packets of assignments to obtain course credit. Teachers were required to take daily attendance, and hand out each student's applicable assignment.  In virtually all Project Graduation courses, the programmed students spanned all grade levels and various subject-matter areas.

109.    Relators were originally under the assumption that these Project Graduation courses were akin to an already-existing remediation course - - Dewey Independent Study Kits ("DISKs") - - which were designed to help students who had failed to pass a given semester by regaining credit through completion of specific criteria in a one-on-one classroom setting.  However, Relators quickly learned that unlike DISK courses, multiple students were placed in a single Project Graduation course with no criteria to follow to obtain grade promotion.  Instead, they were guaranteed a passing grade simply by being enrolled.

110.    For example, in October 2013, AP Chao assigned Relator Klimetz to a Project Graduation course containing fourteen students.  Through Project Graduation, these students obtained credit in multiple Regents-level courses: Math, Science, and History - - all as a result of being enrolled in the same exact course at the same exact time - - for the academic years of 10th, 11th, and 12th grades for different students.  There was no requirement for any student to actually attend class or complete any work.  That is, this course - - as was the case with all Project Graduation courses - - existed in name only, and was created solely for the purpose of fraudulently

awarding credit for these and other students to graduate Dewey, ultimately boosting Dewey's AYP and ensuring continued receipt of federal and state funding.

111.    The original Course Code for Relator Klimetz's Fall 2013 Project Graduation class was GQS11QPI-14, supposedly "taught" during Period 9 in the school day.

112.    After learning that Project Graduation was nothing more than a sham, Relator Klimetz refused to award any of the students enrolled in the course with any grades at the conclusion of the semester.

113.    That December, before realizing that he refused to legitimize Defendants' scheme, AP Chao wrote to Relator Klimetz to ask him for an estimate of what grades he anticipated awarding to his Project Graduation students.  Klimetz did not respond.  A few days later, AP Chao sent a second request, via email, again urging Klimetz to provide the expected grades for his students, despite the fact that the semester was not yet concluded.  Again, Klimetz refused to respond.

114.    Then, on January 14, 2014, AP Chao continued to email Klimetz, this time by demanding that Klimetz provide an explicit grade for each student in each of the subjects they were "studying" in their Project Graduation course.  Still Klimetz refused to enter grades for his Project Graduation course.  On January 30, 2014, Klimetz wrote to AP Chao confirming that he was not legally authorized to award credit in any courses outside of his teaching certification - - as AP Chao well knew - - and explicitly stated that he would not be awarding grades for Project Graduation.  Approximately one week later, after reviewing *Skedula*, Relator Klimetz observed that AP Chao had personally entered passing grades for each of the students in his Project Graduation class.  Two months later, on March 8, 2014, those grades were changed to reflect the

credit in Regents courses bearing non-G-code courses (i.e., courses that now appeared to have been properly programmed in the applicable subject matter area - - science, math, history).

115.   As a result of this fake coursework, all students enrolled in Project Graduation received passing grades - - and indeed high-scoring grades - - that were used to enable them to fraudulently advance to the next grade level or graduate from Dewey.  Based on these fraudulent grade promotions and graduations, Dewey - - through Elvin, and in turn NYCDOE - - reported fraudulent compliance with Dewey's AYP requirements needed to receive continued federal and state funding through Dewey's SIG / ARRA / SWP / ESEA Title I funding.

116.   The student academic transcripts - - comprising both attendance and grade records - - were overwhelmingly all fraudulent due to Elvin's successful implementation of these schemes. Had USDOE become aware at the time that Dewey, through NYCDOE, reported its fraudulent annual statistics, Dewey never would have received continued funding at the levels previously awarded, and indeed USDOE and NYSED both would have been able to recoup funds already paid to Dewey and NYCDOE through USDOE's enforcement mechanisms for Title I, Title III, and IDEA Part B funding, including the school improvement plan corrective action measures outlined above.

117.   That is, Dewey's fraudulent attendance, grade, credit, and graduation schemes created completely fake statistics with respect to Dewey's compliance with its AYP once Elvin implemented Project Graduation, and the other programs described herein.  As a result, Dewey and NYCDOE failed to accurately report its consistent academic failure, including perhaps most notably Dewey's and NYCDOE's underlying "staffing, curriculum, [and] other problems in the school." 34 C.F.R. § 200.42(a)(1)(i)-(ii); *id.* § 200.42(b)(4).  Had Dewey through NYCDOE accurate reported Elvin's fraud, NYSED would have been required by USDOE regulations to

withhold, defer, reduce, and/or recoup funds designated for NYCDOE generally, and Dewey specifically. 34 U.S.C. § 200.53(a), (c).

118.     Despite failing to meet its AYP standards to continue receiving the above-described funding, and despite reporting fraudulent statistics through NYSED's annual and bi-annual reporting to USDOE, 20 U.S.C. § 1226b(a)(1)-(2), Dewey nevertheless received at least $1,738,927.00 in Title I funding for the 2013-2014 school year, and $1,782,804.00 in Title I funding for the 2014-2015 school year.  These funds were paid by USDOE, at least in part, because of NYCDOE's submissions of fraudulent reports comporting to meet Dewey's AYP goals for the 2013-2014 academic school year, as well as $134,195.00 in other New York state grants/funding for 2013-2014 and $168,834.00 in other New York state grants/funding for 2014-2015.

119.     Also during the 2013 fall semester, Elvin and her APs rolled out two other courses - - CUNY Math and College Explorations - - following the same scheme as Project Graduation.

120.     In September 2013, AP Orsini notified Relator Goria that he would be teaching a course called "College Explorations."  Orsini billed it to Goria by explaining that Goria - - as a former college professor - - would be able to "inspire" students and explain what life would be like as a college attendee to help prepare them for the next phase of their education.

121.     Five weeks later - - again, well into the start of the semester - - Relator Goria began "teaching" College Explorations.  As was the case with Relator Klimetz's Project Graduation course, Relator Goria was given pre-printed generic worksheets to distribute to his assigned students.  AP Orsini notified Goria that AP Kenney would be "overseeing" Goria's students' progress to ensure "expectations" were being met.

122.     The course rapidly devolved into an in-class homework completion course for the courses these students needed to pass to either get promoted to the next grade level or graduate, as

no actual instruction occurred and no lesson plans or other course materials existed - - precisely as was the case with Project Graduation.

123.    Subject matter for Relator Goria's College Explorations course included "Earth Science," "Social Studies," "Math," and "Spanish language," all despite Goria only being certified to teach social studies courses.

124.    Goria complained to both AP Kenney and Defendant Elvin that he was not authorized to teach the subject matter contained in the written worksheets designated for the students, again comparable to Relator Klimetz's complaints to AP Chao.  In response, APs Orsini and Kenney, along with Elvin, instructed Goria to simply oversee completion of the assignments and turn in the completed work to either Orsini or Kenney.

125.    At the same time, Goria learned that this College Explorations course was programed to occur at the same time as the students' lunch period.  It became Goria's responsibility to bring the students to Dewey's cafeteria within fifteen minutes of the start of his College Explorations class.  At that point, students were "completing" their assignments in the cafeteria while they were eating lunch, with Goria collecting the students' work and submitting the same to one of Dewey's APs.

126.    Goria again complained to APs Kenney and Orsini, as well as Elvin, reiterating that Goria cannot grade the assignments and questioned the propriety of requiring students to complete work during lunchtime.  Nevertheless, at the instruction of the APs and Elvin, personally, Goria noted his students' assignments were handed out and nominally completed.

127.    Following Goria's complaints about College Explorations, in June of 2014, Elvin retaliated by assigned him an "ineffective" rating - - resulting in the first negative annual rating for Goria in the history of his teaching career.  This was despite Elvin asking Goria to form a student

chorus to perform at the 2014 graduation, while also complying with Elvin's request to coach the school's student wrestling team throughout the school year.  Goria appealed this and a second ineffective rating successfully, reversing both ratings and eliminating them from his record.

128.    Of June 2014, upwards of forty-five Dewey teachers received ineffective ratings - - the highest such statistic in all of New York City for any high school - - all of whom were long-tenured teachers, and the vast majority of whom possessed unblemished teaching records.

129.    These negative evaluations were part of Elvin's campaign to harass and terrorize long-term Dewey teachers and staff, resulting in severely negative teacher evaluations, adverse in-class "mini" observations, false complaints lodged against teachers with the NYSED Office of Special Investigations, and other daily harassment - - all designed to grind down Dewey's teachers and force them to comply with Elvin and her APs' directives to pass students enrolled in any of Elvin's initiatives.

**ELL Students Deprived their Education by Being Forced to Take Classes Taught in Chinese Language**

130.    In addition to fraudulently awarding credit to hundreds of students in the Project Graduation, CUNY Math, and College Explorations fake "courses," Elvin also mandated segregation of certain classes of non-English speaking students whose native language was Mandarin Chinese away from English-speaking students and students whose second language was English.

131.    To perpetrate this unlawful policy, Elvin and her APs programmed native Chinese language speakers into courses that were all taught by one teacher - - Mr. CT Chan.  The courses were not only technically separate from other courses taught at Dewey (i.e., by funneling all such courses to one teacher) - - they were also physically and literally segregated to an all but abandoned wing of Dewey that once housed the long-defunct music department.  That is, students taught by

Mr. Chan were housed in a large amphitheater-style classroom with seating for over 100 students in Dewey's shuttered music department - - the only classroom that accommodates over 100 or more students.

132.     CT Chan taught these segregated courses entirely in Chinese - - including students in all four grade levels - - that were awarded credit as Regents-level courses in that were all required to be taught in English.

133.     CT Chan taught these courses for at least two full school years - - 2013-2014 and 2014-2015.

134.     All of his students were of Asian descent and nearly all were designated as ELLs.

135.     By way of example only, during the Spring 2014 semester, CT Chan taught seven different courses: (1) HGS42QB - 01 - Global Studies 9 2/2; (2) HGS44QB - 01 - Global Studies 10 2/2; (3) HGS44QB - 02 - Global Studies 10 2/2; (4) HUS22QB - 01 - US History 2/2; (5) HUS22QB - 02 - US History 2/2; (6) HVS11X - 02 - AP Government; and (7) HVS11X - 03 - AP Government.  As their course titles suggest, two of these seven courses were Advanced Placement courses.

136.     On or around April 3, 2014 (i.e., near the conclusion of the 2013-2014 academic year), the combined total number of enrolled students across these seven courses from grades nine through twelve (including one student with disabilities enrolled in an IEP) was 204.

137.     Of those 204 students, all but *ten students* were classified as either ELLs or former-ELLs (i.e., those who, up until the previous academic year, had been classified as ELLs).  And all ten of the non-ELL students were of Chinese heritage and could speak and understand Chinese fluently.

138.    All 204 of these students were promoted to the next grade, including forty-three students who were twelfth-graders who graduated from Dewey after receiving credit for CT Chan's class(es).

139.    As a result, because CT Chan taught all 204 of his students in all of his classes during the 2013-2014 academic year *in Chinese* - - not in English - - Dewey completely failed to provide any semblance of a legitimate education to these students, contravening all USDOE requirements for meeting Dewey's AYP, and thereby fraudulently receiving federal and New York state funding for these students.

140.    As a result of Elvin and her APs' direction that CT Chan teach these courses in Chinese instead of English, all students enrolled in one of CT Chan's courses received passing grades that were used to enable them to fraudulently advance to the next grade level or graduate from Dewey.  Based on these fraudulent grade promotions and graduations, Dewey - - through Elvin, and in turn NYCDOE - - reported fraudulent compliance with Dewey's AYP requirements needed to receive continued federal and state funding through Dewey's ELL Title III funding.

141.    Despite failing to meet its AYP standards to continue receiving the above-described funding, Dewey nevertheless received at least $30,287.00 in ELL Title III funding for the 2013-2014 school year, and $62,236.00 in ELL Title III funding for the 2014-2015 school year.  These funds were paid by USDOE, at least in part, because of NYCDOE's submissions of fraudulent reports comporting to meet Dewey's AYP goals for the 2013-2014 academic school year, as well as $134,195.00 in other New York state grants/funding for 2013-2014 and $168,834.00 in other New York state grants/funding for 2014-2015.

**Dewey Failed to Provide Special Needs Students Programmed with *IEPs* with a Statutory-Mandated *FAPE***

142.    Finally, proving that no group was lucky enough to avoid Defendants' fraudulent practices to rob them of a legitimate high school education, Elvin extended her schemes to abuse students with special needs who were programmed into IEPs by failing to provide them with a FAPE through overloaded classrooms, unqualified teachers, and provision of sub-minimal coursework.

143.    Dewey effectively transformed special needs students into nothing more than cash-cows by attempting to promote each and every IEP student to the next grade level without actually providing them with minimal educational opportunities.

144.    As one example of carrying this out, educators would be tasked with "teaching" an untenable amount of classes in a single semester without ensuring any actual educating took place.

145.    For example, during the Spring 2014 semester, Elvin tasked Ms. Jennifer Boyle with teaching a staggering *fifty-two classes* simultaneously, despite NYSED regulations limiting permissible instruction to no more than five courses taught per day per teacher. 8 NYCRR § 100.2(i).

146.    All classes were scheduled to take place in the same classroom, and the coursework spanned nearly all programmable subjects - - including art, history, science, Spanish, physical education, health, and "post-secondary" college-level courses.

147.    Boyle "taught" each of these courses despite only obtaining certification from the Board of Regents to serve as a *middle school teacher* (i.e., for grades five through nine) during the 2013-2014 academic year.

148.    Of these fifty-two classes, twenty-nine separate classes included IEP students. Boyle taught a total of forty-eight IEP students across these twenty-nine classes despite lacking any certification to teach special education courses or students with disabilities.

149.    But like Project Graduation and its related fake courses, Boyle's classes *did not* require any attendance or completion of coursework to promote students programmed into these courses - - including awarding diplomas to fifty-seven students during this time / academic year despite not actually teaching nearly any classes.  This included nineteen students with IEPs obtaining IEP diplomas.

150.    As a result of Boyle's lack of certification to teach special education - - or even *any* high school level courses - - during this academic year, and also considering Boyle's over-programming of an excessive number of classes, all special-needs students enrolled in one of Boyle's courses received passing grades that were used to enable them to fraudulently advance to the next grade level or graduate from Dewey.  Based on these fraudulent grade promotions and graduations, Dewey - - through Elvin, and in turn NYCDOE - - completed failed to provide a FAPE to Dewey's special-needs students who either were or were required to be placed on IEPs, both of which were needed to receive continued federal and state funding through Dewey's IDEA funding.

151.    Moreover, because none of the students programmed into these courses were ever physically present for the classwork, none of these students were eligible to be counted in Dewey's data, which NYCOE used to request IDEA funding for Dewey and other schools within its jurisdiction. 34 C.F.R. § 222.37(b)(4)(i).

152.    Despite failing to comply with providing a mandatory FAPE to these special-needs students, Dewey nevertheless received at least $219,357.00 in IDEA funding for the 2013-2014

school year, and $293,088.00 in IDEA funding for the 2014-2015 school year.  These funds were paid by USDOE, at least in part, because of NYCDOE's submissions of fraudulent reports comporting to display actual student attendance and academic achievement to meet Dewey's compliance with providing an IDEA-mandated FAPE for its special needs students during the 2013-2014 academic school year, as well as $134,195.00 in other New York state grants/funding for 2013-2014 and $168,834.00 in other New York state grants/funding for 2014-2015.

**Defendant NYCDOE Ignores Evidence Of Fraud And Instead Rewards Elvin With A Promotion And Brags About Highest-Ever Graduation Rates**

153.    Beginning in 2013 when they first learned about Project Graduation, and continuing through to the present, Relators have attempted to report the rampant fraud at Dewey to NYCDOE. Relators' complaints have fallen on deaf ears.

154.    After refusing to participate in awarding fraudulent grades for non-existent coursework for Project Graduation as described above, Relator Klimetz attempted to report ongoing issues with fake coursework to United Federation of Teachers ("UFT") Chapter Chairman, Michael Solo.  Specifically, on February 10, 2014, Relator Klimetz emailed Solo to notify UFT that Project Graduation coursework was not properly reflected on students' report cards / transcripts.

155.    The following day, on February 11, 2014, Relator Klimetz again emailed Solo to notify him / UFT that Klimetz had been assigned to teach "Fundamentals of Physics" for the Spring 2014 semester, but that this particular course had "no accompanying course code" and that "as with Project Graduation, there is neither a written course description, syllabus, curriculum, outline, credit/grading policy[,] nor even a clearly elucidated general guideline of purpose and objective." Relator Klimetz explicitly noted his grave concerns that failing to include these requirements in

any programmed course could lead to "suggestions of impropriety or instances of non-compliance, whether viewed through the prism of either the UFT or DOE."

156.    And the following day, on February 12, 2014, Relator Klimetz emailed Solo for a third consecutive day, this time forwarding a copy of the January 14, 2014 request from AP Chao, soliciting Klimetz's Project Graduation student grades over Klimetz's objection.

157.    Klimetz continued reporting ongoing instances of fraudulent coursework and "hyper-programing" of under-performing students into unattainable levels of credit in single semesters through October of 2014.

158.    On March 26, 2014, Relator Klimetz sent a letter to the NYCDOE Office of Special Investigations ("OSI") and New York Board of Regents members Kathleen Cashin and Meryl Tisch, as well as NYSED Commissioner John King.  The letter included a packet of documentary evidence including ARIS records and copies of Transcript Extracts for students who were fraudulently awarded credit for completing, *inter alia*, Project Graduation courses.

159.    Relator Klimetz did not receive a response from OSI or the Board of Regents. However, on December 3, 2014, a team of OSI investigators led by Wei Liu arrived at Dewey to conduct interviews of several individuals identified in Klimetz's April 2014 letter.

160.    OSI's investigation continued through June 2015.  During this time, on June 25, 2015 - - graduation day at Dewey - - students began chanting "easy pass" while lining up to receive their diplomas.

161.    Over the course of its investigation, OSI interviewed: Michael Solo; Joseph Antonucci; Guidance Counselor Roseann Ponce; Guidance Counselor Cheryl Varghese; Teacher Alan Lerner; Relator Klimetz; Ms. Boyle; Teacher Alexander Zeno; Teacher Martha Blitzer; Relator Goria; Teacher Loretta O'Hara; Teacher Kai-Ming Wu; and Teacher Sawsan Hamidi.

162.    OSI later interviewed the following individuals after providing them notice within forty-eight hours that they were subjects of the investigation: AP Marianna Werth; AP Chao; Defendant Elvin; AP Kenney; AP Antonucci; and Deputy Director of Academic Policy Katie Hansen.

163.    On June 30, 2015, merely five days after Dewey's graduation ceremony, the NYCDOE Office of Special Investigations issued an Investigative Report ("OSI Report") based on seven separate OSI cases concerning the conduct of Defendant Elvin, and APs Kenney, Chao, and Antonucci, among others.  The OSI report described an "anonymous complaint" that laid out the extensive grade and credit fraud described above, specifically mentioning "Project Graduation," and the requirement to pass "at least 85 percent of students in their classes."

164.    The OSI Report concluded that, *inter alia*, "no instruction was provided" during Project Graduation, as well as several other courses designated as "PM School" that were billed as "credit recovery courses" and disguised as remediation courses for underachieving students.

165.    As a result of the OSI Report, Confidential Investigator Katherin Higginbotham recommended that OSI's Administrative Trials Unit ("ATU") convene a Technical Assistance Conference and determine "appropriate disciplinary action" against Elvin, Kenney, and Antonucci.

166.    ATU prepared for Elvin's disciplinary hearing for nearly a full year.  But not until April 6 and April 10, 2016, did ATU chief prosecuting attorney Karen Antoine interview / meet with Relators, despite knowing that they were the original "anonymous" complainants who reported the fraud to OSI in the first instance.

167.    Antoine met with both Relators - - Klimetz on April 6, 2016, and Goria on April 10, 2016 - - for a combined total of approximately six hours.  Antoine never took a single note for the entirety of their meetings.

168.     *Two days later*, despite presenting the ATU with overwhelming evidence of the
Dewey fraudulent schemes described above, on April 12, 2016, Arbitrator Jay Nadelbach cleared
Elvin and her APs of any charges of wrongdoing originally identified in the OSI Complaint.  As
the basis for dismissal, Arbitrator Nadelbach puzzlingly ruled that ATU's failure to produce
discovery to Elvin and her defense team warranted dismissal with prejudice.  This decision was
especially troubling because both Relators Klimetz and Goria personally met with ATU lead
prosecuting attorney Karen Antoine for upwards of six hours across multiple days to personally
provide her with the relevant evidence proving the Dewey fraud, and explaining the same.

169.     Arbitrator Nadelbach's decision reinstated Elvin as Principal of Dewey and
awarded her backpay and benefits for the entirety of her suspension.  While Elvin was reinstated
to her Principal role, she had already been *reassigned* as of September 2015 - - i.e., during the
timeframe where she was supposed to have been *suspended without pay* after July 8, 2015 - - from
the role of Dewey Principal to reassignment at NYCDOE headquarters at the Tweed Courthouse
located at 52 Chambers Street in Manhattan.

170.     NYCDOE never appealed the decision, nor did it attempt to provide the evidence
already in its possession to Arbitrator Nadalbach or any other parties to the proceedings.  This
confirmed that NYCDOE's entire investigation into Elvin and Dewey was a mere charade that
neither intended to put a stop to any of the fraudulent practices at Dewey nor punish Elvin and her
team for stealing an education from Dewey's students.

**Relators Continued Attempt to Report the Rampant Fraud at Dewey Through Appropriate
Channels within NYCDOE, NYSED, and the New York Attorney General's Office**

171.     After Arbitrator Nadalbach ostensibly cleared Elvin, her APs, and NYCDOE of any
wrongdoing with respect to Dewey, on May 14, 2016, Relator Klimetz emailed then-Regent
Chancellor Betty Rosa and NYSED Commissioner Mary Ellen Elia.  In his email, Klimetz

explained the voluminous evidence he and Relator Goria both submitted implicating Elvin and her APs in the Dewey fraud, and specifically noted both Relators' relentless efforts to report the fraudulent schemes to stakeholders with the New York Board of Regents - - all without success.

172.    Neither Rosa nor Elia substantively responded to Relators.

173.    On July 18, 2016, Relators then attempted to report the Dewey fraud to the New York State Office of the Attorney General's Public Integrity Unit by submitting a letter outlining the fraudulent coursework, OSI's investigation, the charges against Elvin and her APs, and their eventual acquittal based on a supposed discovery violation through Arbitrator Nadalbach's non-merits decision.  Within four days, the Bureau issued a written statement declining to investigate Relators' allegations

174.    After receiving no response for over a year, Relators Goria and Klimetz again attempted to communicate with Regent Kathleen Cashin.  During late-April / early-May 2017, Relator Klimetz spoke with Regent Cashin to arrange a meeting with NYSED auditors Andrew Fischler and Patrick Orton on May 10, 2017.  Relators both met with Fischler and Orton for over three hours wherein Relators, again, reviewed, explained, and provided substantial evidence to the auditors proving the massive grade fixing operation under Elvin and her staff beginning with Project Graduation and continuing through Elvin's removal in June 2015.

175.    Based on Relators once again reporting this information to the Regents, NYSED agreed upon a special audit into Dewey from the period of Elvin's installation through her removal in June 2015.

176.    Relators continued their efforts to report the Dewey fraud to the powers-that-be within NYSED while awaiting the results of the NYSED audit.

177.    First, Relators submitted a complaint on June 14, 2016, to NYCDOE Special Commissioner of Investigations Richard Condon. Mr. Condon declined to take any official action.

178.    After refusing to wait any longer on a response from Mr. Condon's office, on January 4, 2018, Relators Klimetz and Goria both emailed Executive Deputy Commissioner of NYSED, Elizabeth Berlin, attempting to forge onward with their efforts to hold Elvin accountable for the Dewey fraud.

179.    Before receiving any response, NYSED issued its Final Audit Report of John Dewey High School on March 23, 2018. In its cover letter to then-NYC Deputy Chancellor Phil Weinberg, Ms. Berlin noted that "NYCDOE does not recognize or appreciate the seriousness of the audit findings. NYCDOE must address the findings of this audit and immediately start work on implementing its recommendations *so no more students are cheated out of the education they deserve*." (Emphasis added).

180.    In sum, the NYSED audit found that out of a sample of 280 make-up courses analyzed, 89% did not meet instructional hour eligibility requirements, 77% were taught by teachers without certification in the appropriate subject area, a staggering 96% of courses inappropriately awarded credit, and at least 27% of students graduated with diplomas as a direct result of receiving credit in courses where they should not have earned a passing grade. In brief, the NYSED audit confirmed the Relators' years-long allegations.

181.    In response, Dewey and NYCDOE have done nothing to prevent further credit, grade, and graduation fraud from continuing.

182.    In contrast, since that time, NYCDOE has touted a "record high graduation rate" of 74.3% City-wide.

183.    Notably, when Elvin was initially removed from Dewey in June 2015, her annual salary was $150,926.00.  Elvin - - who is still listed on NYCDOE's payroll as a "Principal" - - now earns an annual salary of $169,916.00.  That is, since first coming under scrutiny for the massive fraudulent activities she perpetrated at Dewey, NYCDOE has *rewarded* Elvin with an approximately 12% increase in her annual earnings.

## FIRST CLAIM FOR RELIEF AGAINST DEFENDANTS
### *Violation of the U.S. False Claims Act: Use of False Records / Statements*

184.    Relators repeat, reiterate, and re-allege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

185.    Relators seek relief on behalf of the United States against Defendants under Section 3729(a)(1)(B) of the False Claims Act.

186.    As a result of using false records in the form of fraudulent attendance records, student transcripts replete with grade-fixing, and awarding diplomas / grade promotion to students who lacked necessary credentials for the same, Defendants knowingly caused to be made false records and/or statements that were material to getting false and fraudulent claims paid by USDOE.

187.    Specifically, Defendants knowingly certified and/or represented that the budget requests and/or AYP reports it submitted on an annual and/or biannual basis for the John Dewey High School caused the United States to pay millions of dollars in USDOE funds.

188.    By reason of these false and/or fraudulent statements that Defendants caused to be made and in fact made, the United States is entitled to recover treble damages plus a civil monetary penalty for each false record or statement.

189.    Moreover, Relators are entitled to recover their attorneys' fees, costs, and expenses incurred in prosecuting this matter.

## SECOND CLAIM FOR RELIEF AGAINST DEFENDANT NYCDOE ONLY
### *Violation of the U.S. False Claims Act: Presenting False Claims for Payment*

190.    Relators repeat, reiterate, and re-allege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

191.    Relators seek relief on behalf of the United States against Defendants under Section 3729(a)(1)(A) of the False Claims Act.

192.    As a result of submitted annual budgetary requests for school funding using USDOE grants, and submitting AYP reports, Defendant NYCDOE knowingly caused false claims to be presented for reimbursement by USDOE through NYSED.

193.    Defendant NYCDOE therefore knowingly caused to be presented false and/or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

194.    By reason of these false and/or fraudulent claims that Defendant NYCDOE knowingly caused to be presented to USDOE, the United States has paid millions of dollars in USDOE grants and school funding, and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

195.    Moreover, Relators are entitled to recover their attorneys' fees, costs, and expenses incurred in prosecuting this matter.

## THIRD CLAIM FOR RELIEF AGAINTS DEFENDANTS
### *Violation of N.Y. False Claims Act: Use of False Records / Statements*

196.     Relators repeat, reiterate, and re-allege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

197.    Relators seek relief on behalf of New York State against Defendants under Section 189(1)(b), N.Y. Fin. L. § 189(1)(b).

198.    As a result of using false records in the form of fraudulent attendance records, student transcripts replete with grade-fixing, and awarding diplomas / grade promotion to students who lacked necessary credentials for the same, Defendants knowingly caused to be made false records and/or statements that were material to getting false and fraudulent claims paid by NYSED.

199.    Specifically, Defendants knowingly certified and/or represented that the budget requests it submitted on an annual and/or biannual basis for the John Dewey High School caused the State of New York to pay millions of dollars in NYSED funds.

200.    By reason of these false and/or fraudulent statements that Defendants caused, New York State is entitled to recover treble damages plus a civil monetary penalty for each false record or statement.

201.    Moreover, Relators are entitled to recover their attorneys' fees, costs, and expenses incurred in prosecuting this matter.

**FOURTH CLAIM FOR RELIEF AGAINST DEFENDANT NYCDOE ONLY**
*Violation of the N.Y. False Claims Act: Presenting False Claims for Payment*

202.    Relators repeat, reiterate, and re-allege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

203.    Relators seek relief on behalf of New York State against Defendants under NYFCA Section 189(1)(a), N.Y. Fin. L. § 189(1)(a).

204.    As a result of submitting annual budgetary requests for school funding using funds provided through NYSED, Defendant NYCDOE knowingly caused false claims to be presented for reimbursement by NYSED.

205.    Defendant NYCDOE therefore knowingly caused to be presented false and/or fraudulent claims for payment or approval in violation of N.Y. Fin. L. § 189(1)(a).

206.    By reason of these false and/or fraudulent claims that Defendant NYCDOE knowingly caused to be presented to NYSED, New York State has paid millions of dollars in NYSED grants and school funding, and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

207.    Moreover, Relators are entitled to recover their attorneys' fees, costs, and expenses incurred in prosecuting this matter.

## DEMAND FOR A JURY TRIAL

208.    Pursuant to FRCP 38(b), Relators, on behalf of the United States and New York State, demand a trial by jury in this action.

## PRAYER FOR RELIEF

**WHEREFORE**, Relators, on behalf of the United States and New York State, demand judgment against Defendants as follows:

a.    A judgment declaring that the practices complained of herein are unlawful and in willful violation of the aforementioned United States and New York State laws;

b.    Preliminary and permanent injunctions against Defendant NYCDOE and its officers, owners, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful practices, policies, customs, and usages set forth herein;

c.    Treble the United States' and New York State's damages, in an amount to be established at trial, plus an $11,000.00 penalty for each false claim submitted in violation of the USFCA and NYFCA;

d.    Awards to Relators for a percentage of the United States' and New York State's recoveries of the proceeds recovered from this suit under the USFCA and NYFCA;

e.      An award to Relators of all attorneys' fees, costs, and expenses incurred in bringing this action under the USFCA, 31 U.S.C. § 3730(d), NYFCA, N.Y. Fin. L. §§ 189(3), 190(2); and

f.      Granting Relators, the United States, and New York State such other and further relief as this Court finds necessary and proper.


Dated: New York, New York
        September, 12 2019

                              Respectfully submitted,

                              BORRELLI & ASSOCIATES, P.L.L.C.
                              *Attorneys for Relators*
                              655 Third Avenue, Suite 1821
                              New York, New York 10017
                              Tel.: (212) 279-5000
                              Fax: (212) 679-5005


            By:     _____
                              MICHAEL R. MINKOFF (MM 4787)
                              ALEXANDER T. COLEMAN (AC 1717)
                              MICHAEL J. BORRELLI (MB 8533)